CHARLES CARREON, ESQ. (127139)
2165 S. Avenida Planeta
Tucson, Arizona 85710
Tel:  520-841-0835
Fax: 520-843-2083
Email: chas@charlescarreon.com

Attorney for Plaintiff iCall, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ICALL, INC., a Delaware-incorporated Corporation Licensed to do Business in California,<br><br>        Plaintiff,<br><br>     vs.<br><br>JULIAN CAIN and ORCHID SEED, LLC, a California Limited Liability Company,<br><br>        Defendants. | Case No.:  SACV 11-00895 JVS (ANx)<br><br>DECLARATION OF ARLO GILBERT IN SUPPORT OF PLAINTIFF'S CORRECTED MOTION FOR ENTRY OF DEFAULT JUDGMENT AND PERMANENT INJUNCTION AND IMPOUNDMENT ORDER AGAINST DEFENDANTS |

**DECLARATION OF ARLO C. GILBERT**

Arlo C. Gilbert declares:

   **1.**   I am the CEO of iCall, Inc. ("iCall"), and make this declaration in support of iCall's Motion for Entry of Default Judgment Against Defendants based on personal knowledge and an informed review of relevant documents, and if called as a witness I could and would so competently testify.

   **2.**   iCall is a self-funded startup company that operates as an FCC-licensed telecommunications provider authorized to operate as a Community Local Exchange Carrier.  I am the founder of iCall, and along with co-founder Andy Muldowney, created the computer code that iCall uses to provide a Voice-Over Internet Protocol ("VoIP") calling platform that operates on desktop computers, the Apple iPhone, and the iPod.  iCall also offers wholesale VoIP solutions through iCall®Carrier Services.  iCall, Inc. offers the iCall® Service in both free and paid versions.  iCall is incorporated in Delaware and has its main office in Dallas, Texas.

3. The iCall® software operates on desktop computers and on the Apple iPhone and iPod. iCall, Inc. offers the iCall® Service in both free and paid versions, and offers wholesale VoIP solutions through iCall® Carrier Services.

4. iCall products and services are offered primarily through the company website at iCall.com.

5. iCall has zealously protected its intellectual property, including the iCall® trademark, the iCall California Service Mark, and the iCall® software. iCall is zealous in protecting its intellectual property of all types. iCall owns the incontestable federal trademark on the iCall® mark, Registration No. 2,194,066, registered October 6, 1998 on the principal register for use in connection with telephone communications services, including aural and optical information transmission. I have also filed a patent application for iCall's proprietary technology that is pending with the United States Patent and Trademark Office ("USPTO") under Application Number 11/625,684, and for international patent registration through the World International Property Organization ("WIPO").

6. VoIP offers considerable cost savings for users over standard telephone service. iCall has harvested substantial recognition in the technical and popular press for its repeated technical "coups," becoming, for example, the first VoIP company to offer an Apple-approved iPhone "App" that not only works on the iPhone, but also converts the iPod Touch media player into a wireless telephone set that can make international calls. iCall is dedicated to remaining at the forefront of VoIP technical development through leading-edge research and development; however, as a self-funded startup, iCall operates within a limited budget.

7. iCall's largest competitor in the VoIP field is Skype. iCall and Skype software are not interoperable. Skype's software is proprietary, not open source. When iCall decided to create an interoperability platform to connect iCall and Skype users over the Internet, it faced the fact that neither Mr. Muldowney nor I, nor any of iCall's employees, had the software coding ability to create an interoperability platform between iCall and

Skype. Accordingly, it was necessary to find a computer coder with skill in this field. I researched extensively to locate appropriate candidates and found only two, one a gentleman with whom I met n Europe, whose research demonstrated he could create a iCall-to-Skype interoperability platform, but demanded an exhorbitant fee to perform the work that was far beyond iCall's capacity to pay. The second person was a man whom I never met in person, but whose work demonstrated to me that he too could create an iCall-to-Skype interoperability platform. That person was known to me as Julian Cain. I say "known to me" because based on work performed by an investigator retained by iCall's attorney, I understand his true name is Ashley Julian Cain, usually listed in public records as Ashley J. Cain. I will refer to him as "Cain" in this declaration.

   8.  After a cordial arms-length negotiation, Cain agreed to write the code for an iCall-to-Skype interoperability platform that is referred to herein as the iCall Open Peer Platform ("iCOPP" or the "iCOPP interface"). We agreed that the code would be a work-for-hire that would work seamlessly with and complement the iCall® software code Mr. Muldowney and I had already created as a joint work. During development, Cain usually referred to the iCOPP interface as "SkyLib," an abbreviation for "Skype Library."

   9.  Attached hereto as **Exhibit A** is the Work-Made-for-Hire Agreement(the "Work-for-Hire Agreement") to which Cain and iCall mutually agreed. I signed on behalf of iCall and Cain signed on his own behalf. The iCOPP interface is defined as the "Product" in Section 1(a), quoted in relevant part as follows:

> "The 'Product' means a platform-independent C++ library to interconnect with Skype that will be functional in Linux in its first iteration, and suitable for back-porting to other platforms."

   iCall has always treated the iCOPP interface development project as a trade secret, and took all reasonable steps to protect the iCOPP interface code from disclosure. The iCOPP code has economic value precisely because how to achieve Skype interoperability is not publicly known, and iCall has always sought to preserve that economic value by exercising all reasonable precautions to keep the iCOPP code a secret. In ¶ 9 of the Work-for-Hire Agreement, Cain agreed that the iCOPP code was to be

Page 3 of 8 OF DECLARATION OF ARLO C. GILBERT

written as a work-for-hire, and that iCall would be designated as the "Author" in the copyright registration. In ¶ 10, Cain agreed that the iCOPP code is the property of iCall. In ¶ 16, all software to which Cain was given access by iCall, including the iCOPP code, was designated as "Confidential Information." In subsection (e) of ¶ 16 Cain agreed to return all confidential information and materials to iCall upon termination of the contracting relationship, and in subsection (f) of ¶ 16, Cain agreed that he was "in a position of confidence and trust" that imposed a duty to maintain the confidentiality of the iCOPP code. Aside from the unpermitted disclosures that Cain said he has made, iCall has never disclosed the iCOPP code to anyone outside of the iCall development team, who have all be enjoined to secrecy by internal agreement.

10. Pursuant to the Work-for-Hire Agreement, iCall paid Cain a $5,000 starting fee as an "incentive to begin work by the Start Date" of October 20, 2010.

11. Once Cain had begun work, he was to bill at the rate of $65/hr. Cain estimated he could complete the code-writing project within eight forty-hour work weeks.

12. Pursuant to the Agreement, **Exhibit A**, ¶ 10, iCall owns the iCOPP interface, and Cain may "not retain code written under this contracting relationship after the termination of the relationship."

13. Cain also agreed in **Exhibit A**, ¶¶ 17 and 18, that he would "not assist any party other than Client to develop any VoIP-related product that shall facilitate interoperability with Skype," and that he would not "attempt to solicit any business or trade from [iCall's] actual or prospective customers or business contacts," or "attempt to divert business away from [iCall]."

14. Cain started work on October 21, 2010, and submitted bills for his work that were promptly paid in full on October 31, 2010 and November 13, 2010.

15. Cain then engaged in a three-week work stoppage, claiming sickness, and then on December 8, 2010, Cain revealed his true intentions in an email to me, a true and correct copy of which is attached as **Exhibit B**, and quoted for the Court's convenience below:

> "***I believe it's time to re-negotiate our contract.*** Since my downtown [sic] ***I have received numerous offers to integrate the Skype protocol into software and hardware devices.*** These competitors have made offers from four times to 100 times the hourly rate that iCall is providing in compensation. ***I have also received buyout offers of $185,500.00 and 2.25 million respectively to hand over all of my research, code, with agreement to not work with anyone else on this technology.***
> Having said that 65 per hour is no longer sufficient and with another child on the way you must understand that income is a priority for me.
> This technology is worth billions and these competitors have driven this fact home.
> ***Think this over and please see how you'd like to proceed if at all.***"
> (**Exhibit B**, emphasis added.)

16. When Cain presented his demand to "renegotiate" the contract, iCall had already invested $80,000 in the contract and had staked much of its development and capital-raising planning on developing the iCOPP interface. Further, because of Cain's unique ability to create the iCOPP interface, iCall had no alternative source of programming talent to complete the iCOPP interface. Cain subjected iCall to economic duress, and the only option was to accede to his demands.

17. Accordingly, on December 17, 2011, iCall paid Cain additionally compensation to meet his demands: (a) $10,000 to restart work, and (b) effective December 30, 2010, $260/hr, four times his contractually-agreed hourly rate.

18. Cain resumed work on the iCOPP interface in late December 2010, after receiving the additional $10,000 payment.

19. Over the next eight weeks, Cain collected payment for an aggregate 127 hours of work at his quadrupled hourly rate, for which iCall made payment made on December 30, 2010, January 14, 2011, January 31, 2011 and February 18, 2011.

20. All payments to Cain were made by the iCall bookkeeper by check to Julian Cain sent to 3904 North Druid, Decatur, Georgia 30033 (the "Decatur address").

21. iCall made the last payment to Cain on February 18, 2011, in the amount of $6,500, despite the fact that Cain had not submitted any new work product to the iCall

collaboration website where Cain was supposed to upload his work and record his hours. I made mention of this to Cain in an email, and he responded via email to say that the failure to upload new work and hourly time records was an oversight; however, after that email, Cain cut off all communications with me and all other iCall employees.

22. On June 9, 2011 Cain sent me an email, a true and correct copy of which is attached hereto as **Exhibit C** with the Subject line "Skype-like" attaching numerous "screenshots" of VoIP software in action that his email says is "Skype-interoperable." I quote Cain's June 9th email in relevant part as follows:

> "Arlo, What would you do with this technology?
> [Reply from Arlo Gilbert]  What do u suggest?
> [Reply from Cain]  I'm just curious as to what you'd do with it.  I'm wanting to deploy it and compete w/ skype."

23. Four days later, on June 13, 2011, Cain sent me an email, a true and correct copy of which is attached hereto as **Exhibit D**, from which I quote in relevant part as follows:

> "I've built the login code (c++). Skype put me in the corner with 5.0 but I've got it handled. Most everyone else seems to have given up on this effort except a few of us.  Do you want to finish the project?"

24. From these emails, I reasonably infer that Cain has completed or almost completed the iCOPP interface, and is displaying his achievements in an effort to re-initiate his cat-and-mouse game with iCall and extract yet more unearned compensation. Although iCall has the sole lawful claim of ownership to the iCOPP interface, Cain is threatening to breach the Work-for-Hire Agreement by selling, transferring or licensing it to a third party.  After I received Cain's June 13th email, I referred the matter to Mr. Carreon to take legal action, and have had no further communications with Cain.  In order to pursue this litigation, iCall registered all the iCOPP code that had been delivered by Cain prior to the above-described breach on an expedited basis, paying the expedited registration fee of $750.  The U.S. Copyright Office issued iCall Registration # TXu 1-739-380 for its authorship of the iCOPP code, a true copy of which is attached hereto as **Exhibit E**.

25.  Regarding the current whereabouts of the iCOPP code, it is virtually certain that Cain has current copies of the iCOPP interface code and related evidence on his personal computers.  Writing computer code does not require any specialized computer, and the iCOPP code could be stored on the hard drive to a laptop machine or a desktop machine, on an external storage drive, or on any type of digital storage medium.

26.  The goal of engaging Cain to create the iCOPP code is to gain a "first mover" advantage in the field of Skype interoperability.  At year-end 2009, Skype's chief technology strategist Jonathan Rosenberg reported Skype had 560 Million registered users.  Skype accounted for 12 percent of the world's international calling minutes in 2009.[1]  More recent statistics indicate that in March of this year, Skype had 30,000,000 users online at one time, and in May of this year, there were 3,500 downloads of the Skype program *per minute*.[2]  The first VoIP company to establish interoperability with Skype, allowing its users to place Skype users in their own "contacts list" and call them directly, will harvest an enormous number of additional customer contacts, score a huge public relations coup, and enhance its customer goodwill exponentially.  Additionally, the recent purchase of Skype by Microsoft was widely reported to be a disappointment for many Skype users, which presents an excellent opportunity for iCall to provide them with a bridge to a new service, if that new service is Skype-interoperable.  These windows of opportunity are fleeting, however.  "Catching the wave" of technological innovation by releasing a iCall-Skype interoperability platform such as the iCOPP code could increase greatly increase our company's valuation.  Indeed, it would not be hyperbole to say that the immediate deployment of the iCOPP code would likely increase iCall's value astronomically.  Conversely, the failure to recover the iCOPP code in Cain's possession will cause irreparable harm, because it would be very difficult to prove the damages resulting from Cain's misappropriation of the iCOPP code in a trial or arbitration proceeding.  Further, even if damages could be assessed against Cain in the astronomical

---

[1] http://gigaom.com/2010/04/20/skype-q4-2009-number/

[2] http://skypenumerology.blogspot.com/

amount that expert testimony would assign to the consequences of his breach, Cain lacks the resources to satisfy such a liability. Thus, the only meaningful remedy for his breach is an injunction compelling him to deliver the iCOPP code and all its derivative versions to iCall.

**27.** The damages that would be recovered in an arbitration proceeding against Cain would certainly vastly exceed $75,000, as more than this amount has been paid to him since he signed the Work-for-Hire Agreement in October of last year, the terms of which he totally breached. When added to the attorneys fees incurred by iCall's counsel, the mere out of pocket costs already substantially exceed $75,000. Accordingly, even making no allowance for an award of foreseeable consequential damages resulting from Cain's breach due to the loss of iCall's business opportunity, the amount in controversy and the likely arbitration award is well in excess of $75,000.

**28.** By seeking an injunction to compel delivery of the iCOPP code, iCall is seeking to mitigate its damages. This will benefit Cain by reducing the amount of his liability. Accordingly, both parties will be benefited by this Court's timely issuance of an injunction as requested by iCall.

**29.** I hereby declare, pursuant to the provisions of 28 U.S.C. § 1746 (2), under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on August 25, 2011 at Dallas, Texas.

DN: email=arlo@icall.com
Date: 2011.08.25 17:12:46 -05'00'

Arlo C. Gilbert